## DENTON v. GURNETT & CO. et al.
### No. 2867.

Circuit Court of Appeals, First Circuit.
March 14, 1934.

Ransom C. Pingree, of Boston, Mass., for appellant.

Charles F. Dutch, of Boston, Mass. (Richard Bancroft and Putnam, Bell, Dutch & Santry, all of Boston, Mass., on the brief), for appellees.

Before WILSON and MORTON, Circuit Judges, and MORRIS, District Judge.

WILSON, Circuit Judge.

Prior to January 5, 1932, Gurnett & Co. conducted a stock brokerage business in Boston in the commonwealth of Massachusetts. The appellant was a margin customer. For some time prior thereto Gurnett & Co. carried on the appellant's account with it 500 shares of the preferred stock of the Massachusetts Utilities Associates, hereinafter referred to as the Utilities stock, and 78 shares of American Telephone & Telegraph Company stock, both of which stocks we understand were purchased on order of the appellant, and on account of which there was due Gurnett & Co. on January 4, 1932, about $4,000.

On January 4, in accordance with an order of the appellant, Gurnett & Co. sold the 78 shares of Telephone stock, which resulted in the debt of the appellant being wiped out on Gurnett & Co.'s books and Gurnett & Co. becoming the debtor of the appellant in the amount of approximately $3,800. The appellant was then entitled to a delivery to him of the 500 shares of Utilities stock.

Prior to the sale of the Telephone stock, Gurnett & Co. had pledged 230 shares of the Utilities stock as security for a loan, which were sold by the pledgee to liquidate its loan and are not in controversy here; 170 shares were also pledged by Gurnett & Co., together with other collateral, to the Guaranty Trust Company of Boston to secure a loan. On January 5, 1932, an involuntary petition in bankruptcy was filed against Gurnett & Co., and a receiver of its assets was appointed by the bankruptcy court. On or after January 5, 1932, the Guaranty Trust Company satisfied its loan by a sale of pledged collateral other than the 170 shares of Utilities stock. The 170 shares of Utilities stock were then returned to the receiver in bankruptcy.

These proceedings were instituted while the Utilities stock was in the possession of the receiver in bankruptcy. The title of a receiver in bankruptcy to the assets of a bankrupt cannot be the same as that of a trustee in bankruptcy. The title vested in a trustee under section 47a, 11 USCA § 75 (a), is superior to that held by the bankrupt, but solely by virtue of the 1910 amendment to section 47. Crucible Steel Co. of America v. Holt (C. C. A.) 174 F. 127; York Mfg. Co. v. Cassell, 201 U. S. 344, 26 S. Ct. 481, 50 L. Ed. 782.

While, in case a trustee is elected and affirmed, his title reverts to the date of the petition in bankruptcy, Bailey v. Baker Ice Machine Co., 239 U. S. 268, 276, 36 S. Ct. 50, 60 L. Ed. 275, it does not appear from the record before this court that a trustee in bankruptcy was ever elected in this case; nor does it appear that at any time during these proceedings a trustee in bankruptcy made any claim to this stock in behalf of the bankrupt's creditors; nor does any one appearing in this court represent a trustee. The bankrupt and the receiver in bankruptcy alone are opposing the appellant's claim. Under the Bankruptcy Act (11 USCA) no title is vested in a receiver in bankruptcy. He merely acts as custodian of such assets as he finds in the possession of the bankrupt, and in any event he or the bankrupt could defend only such title as the bankrupt had upon the institution of proceedings against it.

In December, 1932, a composition was finally effected with the creditors of Gurnett & Co. through a liquidating corporation, which arranged to pay the creditors 50 per cent. in cash and gave its notes for the additional 50 per cent. of the outstanding claims, which may or may not explain why no trustee was ever elected. The composition agreement was approved by the bankruptcy court. The liquidating corporation has defaulted on its notes, and indirectly the real issue now appears to be as to the rights of this appellant as between him and the receiver of the liquidating corporation. The record, however, does not show whether any property in the hands of the receiver in bankruptcy has been returned to the liquidating corporation or to its receiver in accordance with section 70f of the Bankruptcy Act (11 USCA § 110 (e).

Upon the receiver in bankruptcy taking possession of the assets of the bankrupt, he found in its strong box a certificate for 100 shares of the Utilities stock, issued or indorsed in blank, but tagged with the appellant's name. The 170 shares of Utilities stock returned by the Guaranty Trust Company to the receiver in bankruptcy after liquidating its loan were represented by two certificates, one for 100 shares issued in the name of one Ratchesky, and one for 70 shares issued in the name of Garner & Co., both of which certificates were endorsed in blank. It is agreed that no demand was made by the appellant after the sale of the Telephone stock upon Gurnett & Co. for the remaining 400 shares of Utilities stock before bankruptcy, but the bankruptcy petition, filed on the following day after the sale, rendered a de-

mand futile, if not practically impossible after the sale of the Telephone stock and before the filing of the petition in bankruptcy.

The referee held that the appellant was entitled to reclaim the 100 shares, the certificate for which was tagged with the appellant's name, though he was not entitled to demand it until the Telephone stock was sold on January 4; but the referee also held that the appellant was not entitled to receive the 170 shares returned to the receiver by the Trust Company, the only difference being that the 100 share certificate was tagged with the appellant's name, while the certificates for the 170 shares were merely endorsed in blank, although they were purchased and carried by the broker upon the same conditions as the 100 shares found in the strong box, and were also fully paid for on January 4. The 170 shares of stock were as clearly identified as stock purchased for the appellant as the 100 share certificate tagged with his name, since the appellant was the only customer on the books of Gurnett & Co. for Utilities stock, and no other customer of Gurnett & Co. made any claim to this stock.

The ruling of the referee was affirmed by the District Court, and the appellant brings the case here on appeal.

The appellant relies upon the decision of this court in Leonard v. Hunt (C. C. A.) 36 F.(2d) 13, Lewis v. Norman (C. C. A.) 55 F.(2d) 91, and Richardson v. Shaw, 209 U. S. 365, 28 S. Ct. 512, 52 L. Ed. 835, 14 Ann. Cas. 981; while the appellees stress the decisions of the Massachusetts court in which it has been held that the relation between a broker and his customer is that of debtor and creditor, and that the title to stocks purchased on a margin account is in the broker until paid for. A margin customer deposits with a stock broker cash or securities to secure a broker against loss in his dealings with the customer, who, through the broker, may buy and sell stocks on a stock exchange so long as the margin he deposits represents a certain percentage of the total of his purchases, the percentage being determined by the broker or by the rules of the Stock Exchange.

The respective obligations and rights of the broker and customer are somewhat involved and are not exactly duplicated in any other form of business transactions. The rights of the parties in case of default on either side have been the subject of much refinement by the courts of the several jurisdictions. In New York and in most, if not all, of the states, except Massachusetts, it is held that in buying stocks on a margin account or in depositing of securities as a margin, the relation between broker and customer is that of pledgor and pledgee. This is also the rule in the Federal Supreme Court.

The so-called Massachusetts rule that there is a relation of debtor and creditor, with the title to stocks purchased on margin in the broker until fully paid for, is considered to have had its inception in a decision by Chief Justice Shaw in Wood v. Hayes et al., Adm'rs, 15 Gray, 375; but the transaction in that case was not a margin transaction. A broker purchased certain shares of stock for a customer, not on a margin, but with his own money, for which the customer later gave his note, and the broker held the stock as security for the note and afterward pledged them for a personal loan. The customer never paid the note and after the broker's death filed a claim against his insolvent estate on the ground that there had been a conversion. The court held that there was only a contract to deliver the stock on the payment of the note; that the broker retained title to the stock until paid for, and since the stock was never paid for, there was neither conversion nor a breach of contract.

An examination of the cases in Massachusetts, however, discloses that there are other obligations created than those arising out of absolute ownership in the broker, or the simple relation of debtor and creditor. One has only to read the opinions in Re Swift (D. C.) 105 F. 493, 496–498; Re Swift, 112 F. 315, 318 (in which latter case this court said that the difference between the New York rule and the Massachusetts rule was "only in name, and not in substance"); and Richardson v. Shaw, 209 U. S. 365, 28 S. Ct. 512, 514, 52 L. Ed. 835, 14 Ann. Cas. 981 (which involved a Massachusetts transaction, in which it was held that the delivery of stocks purchased on a margin account when fully paid for did not constitute a preference whether the New York rule or the Massachusetts rule prevailed); or the opinions in Covell v. Loud, 135 Mass. 41, 46 Am. Rep. 446; Weston v. Jordan, 168 Mass. 401, 47 N. E. 133; Chase v. Boston, 180 Mass. 458, 62 N. E. 1059, 1060; Rice v. Winslow, 180 Mass. 500, 502, 62 N. E. 1057; Furber v. Dane, 203 Mass. 108, 115, 89 N. E. 227; Crehan v. Megargel, 235 Mass. 279, 282, 126 N. E. 477; Papadopulos v. Bright, 264 Mass. 42, 47, 161 N. E. 799, to discover that in the development of the Massachusetts rule there has been at times more or less doubt expressed or implied as to the true relation between a broker and a customer trading on a margin. The Massachusetts court, especially in the earlier cases, has

not always based its decision solely on ownership by the broker of stocks bought on a margin account, or upon the simple relationship of debtor and creditor, and has often supported the results arrived at by saying that they followed whether the broker's title was that of owner or pledgee.

In Chase v. Boston, supra, Chief Justice Holmes said, in expressing some of the difficulties of harmonizing logically the relation under the so-called Massachusetts rule with the actual facts:

"No doubt, whichever view be taken, there will be anomalies, and no doubt it is possible to read into either a sufficient number of implied understandings to make it consistent with itself. Purchases on margin certainly retain some of the characteristics of ordinary single purchases by an agent, out of which they grew. The broker buys and is expected to buy stock from third persons to the amount of the order. Rothschild v. Brookman, 5 Bligh (N. S.) 165; 2 Dow & C. 188; Taussig v. Hart, 58 N. Y. 425. *He charges his customer a commission. He credits him with dividends and charges him with assessments on stock. However the transaction is closed, the profit or loss is the customer's.* But none of these features is decisive." (Italics supplied.)

The italicized characteristics surely are not all common to absolute ownership by the broker.

The Supreme Court, in Richardson v. Shaw, supra, laid down certain features of the relationship between a margin customer and a stock broker (according to the margin then required of a customer), which are general, whether the New York rule or the Massachusetts doctrine prevails:

"The broker undertakes and agrees—

"1. At once to buy for the customer the stocks indicated.

"2. To advance all the money required for the purchase beyond the 10 per cent furnished by the customer.

"3. To carry or hold such stocks for the benefit of the customer so long as the margin of 10 per cent. is kept good, or until notice is given by either party that the transaction must be closed. An appreciation in the value of the stocks is the gain of the customer, and not of the broker.

"4. At all times to have, in his name and under his control, ready for delivery, the shares purchased, or an equal amount of other shares of the same stock.

"5. To deliver such shares to the customer when required by him, upon the receipt of the advances and commissions accruing to the broker; or,

"6. To sell such shares, upon the order of the customer, upon payment of the like sums to him, and account to the customer for the proceeds of such sale."

The court in this case also further characterizes the relation of the broker to the customer, page 375 of 209 U. S., 28 S. Ct. 512, 515:

"The position of the broker is twofold. Upon the order of the customer he purchases the shares of stocks desired by him. This is a clear act of agency. To complete the purchase he advances from his own funds, for the benefit of the customer, 90 per cent. of the purchase money. Quite as clearly he does not, in this, act as an agent, but assumes a new position. He also holds or carries the stock for the benefit of the purchaser until a sale is made by the order of the purchaser or upon his own action. In thus holding or carrying he stands also upon a different ground from that of a broker or agent whose office is simply to buy and sell. To advance money for the purchase, and to hold and carry stocks, is not the act of a broker as such. In so doing he enters upon a new duty, obtains other rights, and is subject to additional responsibilities."

Justice Holmes, then a member of the Supreme Court, in affirming the decision of the court, said:

"If I had been left to decide this case alone I should have adhered to the opinion which, upon authority and conviction, I helped to enforce in another place. I have submitted a memorandum of the reasons that prevailed in my mind to my brethren, and, as it has not convinced them, I presume that I am wrong. I suppose that it is possible to say that, after a purchase of stock is announced to a customer, he becomes an equitable tenant in common of all the stock of that kind in the broker's hands; that the broker's powers of disposition, extensive as they are, are subject to the duty to keep stock enough on hand to satisfy his customers' claims; and that the nature of the stock identifies the fund as fully as a grain elevator identifies the grain for which receipts are out. It would seem to follow that the customer would have a right to demand his stock of the trustee himself, as well as to receive it from the bankrupt, on paying whatever remained to be paid. A just deference to the views of my

brethren prevents my dissenting from the conclusion reached, although I cannot but feel a lingering doubt."

It is, of course, clear that whatever the rights of the parties are in stocks bought by a broker for a customer on a margin account, under the so-called Massachusetts rule, they are not those arising from absolute ownership. Such stocks are held or carried by the broker subject to an obligation to deliver to the customer upon payment and demand. While a broker may pledge them to secure a loan, he cannot sell them to a third person unless for his own protection, because of the customer's failure to supply sufficient margin, without being liable for conversion in case tender and demand are made, unless he has in his possession or control other and a sufficient number of shares of the same stock for delivery on demand to the customer in case of payment. The result in actions of law under the Massachusetts rule between broker and customer, based on contractual rights, may well be different from those enforced in a court applying the principles of equity, as in a bankruptcy court, when the stocks have been fully paid for, are in the possession of the bankrupt, can be identified, and are claimed by the customer. ·

 It is admitted that the ·sale of the Telephone stock left a balance on the books of the brokers in favor of the appellant of approximately $3,800, and that the appellant was, on January 4, 1932, entitled to a delivery of the Utilities stock. The rights of the appellant in the bankruptcy court, therefore, as to these stocks, were not those of a debtor or creditor, but of a purchaser who has paid full value and was entitled to delivery on demand.

The appellant's rights in the Utilities stock are not controlled by cases where stocks purchased on a margin have never been fully paid for, as in Covell v. Loud, supra; Crehan v. Megargel, supra, and Chase v. Boston, supra; or where the action is one at law on a contract, Hammon v. Paine (C. C. A.) ·56 F.(2d) 19; or where stocks purchased on a margin have been sold in liquidation of a margin account and no surplus exists in the hands of the broker or a trustee in bankruptcy, In re Codman, Fletcher & Co. (C. C. A.) 287 F. 806. No case cited or examined in Massachusetts involves the same facts as this case, and in which the rights of a purchaser, who has fully paid for the stocks, were determined in equity. The rights of these parties, except as determined by the bankruptcy act, however, are to be determined in the bankruptcy court according to the general principles of equity.

 Since there was not a sufficiently reasonable time after the sale of the Telephone stock before the filing of the petition to make a demand and take a delivery of the Utilities stock, and it appears that the bankrupt could not then have delivered the stock, it being pledged for a loan, and in any event the filing of the petition in bankruptcy rendered a demand futile, we think the appellant is in the same position, as between him and the bankrupt, as though a demand had been made prior to the filing of the petition; and since no trustee is making any claim to the stock, neither the receiver in bankruptcy nor the receiver of the liquidating corporation has any better claim to this stock than the bankrupt had on'January 5, 1932.

There is nothing in the Bankruptcy Act that gives the bankrupt, or a receiver in bankruptcy as custodian of the property found in the possession of a bankrupt, a title to stocks in the possession of a bankrupt broker superior to that of a customer, who has fully paid for them, and which can be clearly identified as the stocks purchased and carried for the customer by the broker. (No inference is to be drawn that if a trustee had been elected the result would necessarily have been different.) To hold otherwise would amount to an unjust enrichment of the creditors of the bankrupt, since they would in this case reap the entire benefit of the sale of the Telephone stock as well as the proceeds derived from the sale of the 400 shares of the Utilities stock.

 A bankrupt, until a trustee in bankruptcy is appointed, holds his assets as a trustee for the benefit of his creditors, Johnson v. Collier, 222 U. S. 538, 32 S. Ct. 104, 56 L. Ed. 306; but the rights of a customer in shares of stock purchased for him and fully paid for prior to bankruptcy and clearly susceptible of identification in the hands of the bankrupt, or of a receiver in bankruptcy is, we think, under the general principles of equity, superior to that of a general creditor of the bankrupt.

If the petition in bankruptcy had not been filed, and it was shown that the broker was insolvent, and had the stock in his possession and fully paid for, the customer would have been entitled in equity under the Massachusetts decisions to have such shares of Utilities stock transferred to him, since he would have no adequate remedy in a suit at law to recover damages for conversion or refusal to deliver the stock, which is recognized in Mas-

sachusetts as sufficient grounds for ordering specific performance. See Goodhue v. State Street Trust Co. et al., 267 Mass. 28, 43, 165 N. E. 701, 707, in which case the court said as to chattels: "Insolvency has been held to be a good reason for decreeing specific performance on the ground that there can be no adequate legal remedy against an insolvent," citing Clark v. Flint, 22 Pick. 231, 238, 33 Am. Dec. 733. In such a case, to go out and buy stock in the open market would not make a purchaser whole, where, as in this case, his stock had already been paid for.

■ This case does not involve as a preliminary issue the jurisdiction of a court of equity, as in the case of Brown v. Corey et al., 191 Mass. 189, 77 N. E. 838. The parties are already in a court where rights of the parties, except as determined by the act, are determined according to equity. Once in a court in which the principles of equity prevail, the court will seek to do justice in all respects between the parties. To permit either receiver in this instance to keep the proceeds received from the sale of the Telephone stock and the proceeds of the 400 shares of Utilities stock, too, would be unconscionable, and result in an unjust advantage to the creditors of the liquidating corporation.

We cannot believe that the Massachusetts court would carry its doctrine so far as to hold that a court, in which equitable principles prevail, cannot do justice between a bankrupt broker, his creditors, and a customer for whom the broker has bought stocks, which have been fully paid for. If there had been time and the 170 shares of Utilities stock had been redeemed from the pledge, the bankrupt could have transferred this stock to the appellant at any time before bankruptcy, after having received full payment therefor, without constituting a preference. Richardson v. Shaw, supra. No injustice results to creditors when stocks fully paid for are transferred to a customer, and great injustice may result to the customer, if the amount paid for stocks and the stocks also are appropriated to the benefit of the bankrupt's creditors. If such is the result, it may be explained by what Justice Holmes termed the "anomalies" of the relations between a broker and a margin customer; but it is not equity.

Since an equity court may order that done which ought to be done, and equity looks to the intent and not to form and seeks to do justice where a strict application of the law fails, under the circumstances of this case, we think the bankruptcy court should have required the receiver in bankruptcy to deliver the 170 shares of Utilities stock to the petitioner, appellant.

The order of the District Court as to the 100 shares tagged in the name of the appellant is affirmed. The order as to the 170 shares of Utilities stock returned by the bank to the receiver is vacated with costs to the appellant, and the 170 shares of the Utilities stock are ordered to be delivered to the petitioner.